***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission.
2. As of the September 22, 1999 diagnosis of the alleged injury, and for approximately 37 months prior thereto, an employee-employer relationship existed between plaintiff and defendant-employer.
3. At all relevant times Kemper Insurance Company was the carrier responsible on the risk.
4. The parties hereto are subject to and bound by the North Carolina Workers' Compensation Act.
5. The Industrial Commission has subject matter and personal jurisdiction over the parties to this action and the claims asserted herein.
6. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
7. On or about September 22, 1999, plaintiff was diagnosed with bilateral carpal tunnel syndrome.
8. On September 22, 1999, plaintiff was earning an average weekly wage of $320.04 which yields a compensation rate of $213.36.
9. Plaintiff underwent surgery on her right upper extremity on August 14, 2000 and returned to work on August 28, 2000. Plaintiff underwent surgery on her left upper extremity on January 15, 2001 and was expected to attempt to return to work on March 5, 2001.
10. Plaintiff has received no temporary total disability benefits as there is a dispute regarding the compensability of plaintiff's claim.
11. The parties stipulated into evidence, without need for further authentication or verification, the following:
• Stipulated Exhibit 1 Plaintiff's medical records;
 • Stipulated Exhibit 2 Official floral clerk job description;
 • Stipulated Exhibit 3 Official deli/bakery clerk job description;
 • Stipulated Exhibit 4 Workers' compensation incident report 1999;
 • Stipulated Exhibit 5 — Workers' compensation incident report 2000;
 • Stipulated Exhibit 6 Application for employment 1996;
 • Stipulated Exhibit 7 Employee after-employment information 1996; and
 • Stipulated Exhibit 8 Transcript of plaintiff's recorded statement.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner in this matter, plaintiff was a 52 year old female. Plaintiff became employed with Lowe's Foods on August 12, 1996 and at the time of the Deputy Commissioner hearing, continued to be employed by defendant-employer in the bakery department. Prior to plaintiff's employment with defendant-employer she had not experienced any problems with her arms or hands.
2. When plaintiff began working with defendant-employer on August 12, 1996, she was working part-time in the floral department of defendant-employer's grocery store. On April 7, 1997, plaintiff became a full-time employee working part time in the floral department and part time in the deli. Plaintiff worked 22 to 36 hours per week thereafter, spending approximately five to six hours per day in the floral department and the remaining time working in the deli. In March 1999, plaintiff became a full-time employee in defendant-employer's bakery department. When plaintiff began working in the bakery department she worked eight-hour shifts.
3. Plaintiff was the only employee in the floral department. Her duties involved serving customers, taking orders, and cleaning up, as well as making flower arrangements, corsages, and boutonnieres. Plaintiff was also responsible for making bows for floral arrangements and plants and other bows to order.
4. In making bows, corsages and boutonnieres, plaintiff was required to work with a fine grade floral wire, tightly gripping the materials, either the bow ribbon or the floral items, with her left thumb and index finger and tightly gripping and twisting the wire using her right hand and wrist while pinching the wire between her right thumb and index finger.
5. The bows took approximately five minutes per bow to make and the corsages and boutonnieres took approximately 20 to 30 minutes each to make. The volume in the floral department depended upon customer demand, with demand greatly increasing on holidays such as Easter, Valentine's Day and Mother's Day or high school and college formals.
6. Plaintiff's work in the deli department including preparing salads and sandwiches and slicing meat and cheese with a hand-operated slicing machine.
7. Prior to February 1999, plaintiff began experiencing pain in her hands, arms, right shoulder and back. On February 14, 1999, plaintiff had a large order of corsages but was unable to complete the order due to severe pain in her upper extremities.
8. In March 1999, plaintiff transferred exclusively to the bakery department. Between March 1999 and August 2000, plaintiff made approximately 200 separately packaged bakery products each day.
9. Plaintiff's duties as a baker involved taking frozen bread dough from the freezer, working it up using her hands to roll the bread and spraying the bread dough with a spray bottle to keep it moist as it was being worked up. Thereafter, plaintiff placed the dough in a steamer to make it rise and then in the oven to bake it. After the bread was baked, plaintiff removed it from the oven and sprayed it with a hand spray bottle of "Baker's Bright". The spray bottle plaintiff used to keep the bread moist and to apply the "Baker's Bright" was a plastic bottle with a trigger pulled by the index and second or third fingers.
10. Once the bread was baked, plaintiff placed each item in a bag, took a fine grade wire and twisted it around the bag and priced the bread.
11. Plaintiff's upper extremity pain and weakness continued and worsened, and on June 14, 1999, she presented to Dr. Marshall Murrey, her family doctor, complaining of numbness in her hands and tingling in her left arm. Plaintiff was referred by Dr. Murrey to Dr. Stephen Fleming, a board-certified orthopedic surgeon with an additional hand qualification. Plaintiff presented to Dr. Fleming on August 11, 1999, at which time she was diagnosed with bilateral carpal tunnel syndrome and was referred to Dr. Suzanne McAdams, an neurologist, for nerve conduction studies. Plaintiff's nerve conduction studies revealed moderate to severe carpal tunnel syndrome bilaterally with the left side worse than the right, which affected both the motor and sensory fibers and acute denervation on the left. Plaintiff was given a cortisone injection to her right carpal tunnel on September 22, 1999. On February 4, 2000, plaintiff was again experiencing problems and received a second cortisone injection to the right carpal tunnel. By July 21, 2000, plaintiff's carpal tunnel symptoms had increased to the point that surgery was recommended.
12. On August 14, 2000, plaintiff underwent a right carpal tunnel release performed by Dr. Fleming. Plaintiff was out of work on Dr. Fleming's orders for two weeks following surgery, returning to work on August 28, 2000.
13. Thereafter, plaintiff continued to experience problems with her left carpal tunnel and on January 15, 2001 underwent a left carpal tunnel release performed by Dr. Fleming. Following surgery plaintiff was out of work on the orders of Dr. Fleming until she returned to work on March 5, 2001.
14. Dr. Fleming was of the opinion that it is very likely that plaintiff's job duties significantly contributed to her bilateral carpal tunnel syndrome. It was Dr. Fleming's opinion that activities that require pinching and grasping, particularly with the wrist in a flex position, increase the risk of contracting carpal tunnel syndrome. Dr. Fleming was also of the opinion that plaintiff's job duties with defendant-employer were a major contributing cause to her bilateral carpal tunnel syndrome and that her floral work would have worsened carpal tunnel syndrome. While Dr. Fleming acknowledged that age, heredity and hypothyroidism could be other contributing causes, he stated that plaintiff's duties with defendant-employer were a major contributing factor in the development of her carpal tunnel syndrome.
15. Dr. Fleming was further of the opinion that job duties such as those plaintiff performed for defendant-employer placed plaintiff at an increased risk of contracting carpal tunnel syndrome than members of the general public not so employed.
16. At the time of Dr. Fleming's deposition, he was of the opinion that plaintiff was at maximum medical improvement of her right hand and retained a 3% permanent partial impairment of the right hand. At that time, he was also of the opinion that plaintiff was almost at maximum medical improvement of her left hand and that he anticipated assigning a 3% partial impairment of the left hand at her following visit.
17. Plaintiff contracted bilateral carpal tunnel syndrome on or about September 22, 1999.
18. Plaintiff's bilateral carpal tunnel syndrome was proximately caused by her regular work duties working in the floral department and the bakery department in the course of her employment with defendant-employer.
19. Plaintiff's job duties as a worker in the floral department and bakery department placed her at an increased risk of contracting bilateral carpal tunnel syndrome than members of the general public not so employed.
20. As a direct and proximate result of her compensable occupational disease, plaintiff was unable to engage in activities required by her former job or any other job from August 14, 2000 through and including August 27, 2000 and from January 15, 2001 through and including March 4, 2001.
21. Plaintiff has reached maximum medical improvement.
22. As a direct and proximate result of plaintiff's compensable occupational disease, Plaintiff retains a 3% permanent partial disability to the right hand and a 3% permanent partial disability to the left hand.
23. The treatment which plaintiff has received for her bilateral carpal tunnel syndrome was reasonably designed to effect a cure, give relief and lessen the period of disability.
24. This matter was appealed to the Full Commission by defendants from an Opinion and Award awarding benefits to plaintiff and results in an affirmation of that award.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff contracted bilateral carpal tunnel syndrome on or about September 22, 1999 which was proximately caused by her regular duties working in the floral department and the bakery department in the course of her employment with defendant-employer. N.C. Gen. Stat. §97-53(13).
2. Plaintiff's job duties in the floral department and bakery department placed her at an increased risk of contracting bilateral carpal tunnel syndrome than members of the general public not so employed. N.C. Gen. Stat. § 97-53(13).
4. As a direct and proximate result of her compensable occupational disease, plaintiff was unable to engage in activities required by her former job from August 14, 2000 through and including August 27, 2000 and from January 15, 2001 through and including March 4, 2001. N.C. Gen. Stat. § 97-29.
5. As a direct and proximate result of plaintiff's compensable occupational disease, plaintiff retains a 3% permanent partial disability to the right hand and a 3% permanent partial disability to the left hand. N.C. Gen. Stat. § 97-31(12).
6. The treatment which plaintiff has received for her bilateral carpal tunnel syndrome was reasonably designed to effect a cure, give relief and lessen the period of disability. N.C. Gen. Stat. § 97-25.
7. Plaintiff earned an average weekly wage of $320.04, yielding a compensation rate of $213.37. N.C. Gen. Stat. § 97-3(5).
8. As a direct and proximate consequence of plaintiff's occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $213.37 per week for the period from August 14, 2000 through and including August 27, 2000 and from January 15, 2001 through and including March 4, 2001. N.C. Gen. Stat. § 97-29.
9. As a direct and proximate result of plaintiff's compensable occupational disease, plaintiff is entitled to permanent partial disability compensation for her 3% permanent partial disability to the right hand and her 3% permanent partial disability to the left hand at the rate of $213.37 for a period of twelve weeks. N.C. Gen. Stat. §97-31(12).
10. Plaintiff is entitled to an attorney's fee assessed against defendants in the amount of $750.00 pursuant to N.C. Gen. Stat. §97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For her compensable bilateral carpal tunnel syndrome, defendants shall pay temporary total disability compensation to plaintiff at the rate of $213.37 per week for the period from August 14, 2000 through and including August 27, 2000 and from January 15, 2001 through and including March 4, 2001. These amounts have accrued and shall be paid in a lump sum. This amount shall be paid subject to an attorney's fee contained in Paragraph 3.
2. For her compensable bilateral carpal tunnel syndrome, defendants shall pay permanent partial disability compensation to plaintiff at the rate of $213.37 for a period of twelve weeks. This amount shall be paid subject to an attorney's fee contained in Paragraph 3.
3. A reasonable attorney's fee of 25% of the compensation due under Paragraphs 1 and 2 of this Award is approved for plaintiff's counsel and shall be paid by deducting from that sum and paid directly to plaintiff's counsel.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable bilateral carpal tunnel syndrome.
5. Defendants shall pay the costs, including a reasonable attorney's fee of $750.00 to plaintiff's attorney.
This the ___ day of March 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/mhb